**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Senior Airman DEANDREA D. ATWATER**
**United States Air Force**

**ACM 38425**

**16 October 2014**

Sentence adjudged 23 March 2013 by GCM convened at Minot Air Force Base, North Dakota. Military Judge: Natalie D. Richardson.

Approved Sentence: Bad-conduct discharge, confinement for 6 months, and reduction to E-1.

Appellate Counsel for the Appellant: Captain Michael A. Schrama.

Appellate Counsel for the United States: Major Daniel J. Breen; Major Roberto Ramírez; and Gerald R. Bruce, Esquire.

Before

HECKER, WEBER, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

TELLER, Judge:

A panel of officer and enlisted members convicted the appellant, contrary to his pleas, of aggravated sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920.[1,2]

---

[1] The appellant was originally charged with one specification of rape by force of Airman First Class (A1C) MN, one specification of aggravated sexual assault of another Airman, and unlawful entry into the room of the second Airman. The appellant was acquitted of the aggravated sexual assault and unlawful entry involving the other Airman and found guilty of the lesser included offense of aggravated sexual assault of A1C MN.

[2] The appellant was charged with violations of Article 120, UCMJ, 10 U.S.C. § 920, as it applied to offenses committed between 1 October 2007 and 27 June 2012. *See* Article 120, UCMJ, 10 U.S.C. § 920 (2006) (amended

The court sentenced him to a bad-conduct discharge, confinement for 6 months, and reduction to E-1. The convening authority approved the sentence as adjudged.

The appellant argues: (1) the evidence was factually insufficient to convict him of aggravated sexual assault; and (2) unreasonable delay in post-trial processing deprived him of his due process rights. Finding no error materially prejudicial to the substantial rights of the appellant occurred, we affirm.

*Background*

The conviction in this case arose out of a sexual encounter between the appellant and Senior Airman (SrA) MN on 15 October 2011.[3] The two had arranged a date to see a movie together, and SrA MN then accompanied the appellant back to a friend's on-base house where he was staying. The appellant's and SrA MN's accounts of the events that followed differ substantially.

According to SrA MN, while she willingly participated in some foreplay, she never consented to sexual intercourse. She testified she went back to the house with the appellant and lay down on the bed with him. They kissed for some time, and she felt his penis with her hand. When he began to reach down her pants, she tried to push his hand away. He then began trying to pull her pants down. According to SrA MN, she grabbed the front of her pants in an effort to prevent the appellant from pulling them down, but he raised her legs onto his shoulders and pulled her hips off the bed, enabling him to pull off her pants despite her efforts. The appellant then began to have sexual intercourse with SrA MN despite her telling him to stop. She tried to push him off and punched at him, but his body weight pressing down on her prevented her from escaping. He told her to relax and that she was tense, and he continued to have sex with her. At some point prior to ejaculation, the appellant did stop and let SrA MN get up. She yelled at him for having sex with her after she told him to stop. She then put her pants back on, gathered her belongings, and left. A DNA expert testified that none of the appellant's DNA was recovered from either the vaginal swabs collected from SrA MN later that day or from her underwear.

On both direct and cross-examination, SrA MN's description of events was incomplete. She could not remember whether she felt the appellant's penis through his clothes or put her hand down his shorts. Nor could she describe exactly how her pants came off. She also could not recall exactly when or why the appellant stopped having sex with her.

---

by National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109–163, 119 Stat. 3136) (superseded by National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat. 1298).

[3] At the time of the offense, Senior Airman MN was an A1C, but she had been promoted to Senior Airman by the time of trial.

In contrast, the appellant testified the sexual intercourse was consensual but SrA MN became upset when he told her he was still married. According to the appellant, after they lay down on the bed and began kissing, SrA MN reached inside his pants and began to feel his penis. He tried to put his hands inside her pants, but they were too tight. He testified that she unbuttoned her pants to allow him to reach inside and digitally penetrate her and that they both took off their shirts and kissed for a period of time before he took off her pants. According to the appellant, when SrA MN's pants would not come off easily, she raised her legs into a vertical position to allow him to remove them. He then left the bed and retrieved a condom from an adjacent room. As he was putting on the condom while standing next to the bed, SrA MN removed her underwear. The appellant testified they resumed kissing, then engaged in sexual intercourse, and he stopped the sexual intercourse when SrA MN said "that's enough." According to the appellant, the two cuddled for a while until the subject of his son and his marriage came up. The appellant told SrA MN he "wasn't looking for anything serious at the time because [he] . . . was married" and "[they] shouldn't do this again." After he said this, SrA MN immediately got dressed and left without explanation.

In addition to SrA MN's testimony, the Government admitted evidence of text messages sent between the appellant and SrA MN, as well as a pretext phone call arranged by law enforcement.

Soon after SrA MN left the house, the appellant sent her a series of text messages, most of which she ignored. SrA MN also testified that the appellant repeatedly tried to call her during this period. At 0116, shortly after SrA MN left the house, the following text message exchange occurred:

> [Appellant:] I know your not gonna answer I just wana apologize foe whatever went wrong idk I'm just lost
>
> [SrA MN:] I had to punch u for u to actually stop and get off me
>
> thats sad

At 0129 it continued:

> [Appellant:] I didn't even fell you punch me at all like I'm lost I would like to talk to you for a min
>
> [SrA MN:] no ur good… gn
>
> [Appellant:] I'm begging you to talk now

I f[****]d this one up bad

Later at 0257, after other messaging, SrA MN confronted the appellant more directly:

[SrA MN:]    no.. u didn't here me tellin u stop and feel me pushin u off and u still didn't f[****]n stop… people would consider that s[**]t rape"

[Appellant:]    Whoa did I really?

[SrA MN:]    good bye

The appellant sent four more requests to talk with SrA MN, then at 0303 continued:

[Appellant]:    I really don't know what else to do. You saying I raped you really hurts

[SrA MN:]    well what do u wanna call it.. if im constantly tellin u to stop and u still don't stop and im pushin u off and still nothing.. so what you call that??

[Appellant:]    You right I'm wrong

The appellant sent several more messages from 0312 to 0950, during which time SrA MN occasionally responded by telling him to stop texting her. At 1032, SrA MN continued:

[SrA MN:]    so im contemplating if i should tell someone about wat happened last night or not

[Appellant:]    Really [M]?

I think we should talk about it and see where things went wrong

[SrA MN:]    what do you mean where things went wrong?? for one u didnt stop wen i told you to stop. while u was tryn to take my pants off u was pullin them off anyways.. i was pushin u off and

> u still didnt stop.. even wen i did that little punch and said stop u said are u serious i told u yea and u still didn't stop… so u tell me what didn't go wrong

[Appellant:] When I was taking of your pants I couldn't get them off then I felt like you raised your legs up so they would come off easier that's just how itook it

[SrA MN:] no dre u couldn't get them off because I was holdin on to them for dear life YOU raised my legs up

[Appellant:] I guess things just happened to fast idk. I understand you not wanting to talk to me anymore but this isn't something we can't workout

[SrA MN:] no they happened to fast because u wouldn't f[****]n listen to me wen I said stop.. i told u before we even got to the base. don't try no funny s[**]t because ur not gonna get far.. so u forced the s[**]t

SrA MN reported the incident to authorities later that day. That night, SrA MN contacted the appellant via text message to set up a pretext phone call at the request of the Air Force Office of Special Investigations (AFOSI). Judging from the break in text messages, the call lasted approximately 35 minutes.

Although the call was not recorded, an AFOSI investigator listened in while it was occurring. During the call, the appellant offered several general, equivocal apologies. The investigator testified that towards the end, SrA MN asked a series of specific questions:

> She had asked him if he was sorry for forcing her to have sex with him and he said "Yes." She had asked him, you know, "Are you just saying this?" "Is this just something you are saying just to appease me, or do you really mean it?" At that point he gave an affirmative, ["]Yeh, I'm sorry, you know, I'm sorry for all of it.["]

At trial, the appellant explained that he only apologized to satisfy her:

> Like I said, she said "Just apologize to me." I said, "I apologize." And she was like; she said "Are you just saying that because you are sincere? Or are you just saying that because I am just telling you to say that," or "Are you saying that because you are sincere?" I said, "I apologize." That's what I said.

*Factual Sufficiency*

We review issues of factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether, after weighing the evidence and making allowances for not having observed the witnesses, we ourselves are convinced of the appellant's guilt beyond a reasonable doubt. *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). Applying these standards to the record in this case, we find the evidence factually sufficient to support the findings of guilt.

Under the version of Article 120, UCMJ, in effect at the time of the offense, aggravated sexual assault as a lesser included offense of rape by force had two elements: "(1) causing another to engage in a sexual act, and (2) causing bodily harm." *United States v. Alston*, 69 M.J. 214, 216 (C.A.A.F. 2010). Both parties agree that the appellant and SrA MN engaged in a sexual act, specifically intercourse. The question presented is whether the evidence is factually sufficient that the appellant caused the intercourse by bodily harm. Article 120(t)(8), UCMJ, defined bodily harm as "any offensive touching of another, however slight." In proving the offensive nature of the touching, the Government had the burden of proving beyond a reasonable doubt that the alleged victim did not consent. *See States v. Ignacio*, 71 M.J. 125, 125–26 (C.A.A.F. 2012) (per curiam).

Despite SrA MN's lack of recollection as to parts of the encounter, her version of events matches the circumstantial evidence more closely and has greater credibility. If the appellant's version of the events were true, we believe he would have contested the repeated allegations and assertions SrA MN made in the text messages. On five distinct occasions in text messages sent within twelve hours of the alleged offense, SrA MN unequivocally asserted that the appellant did not stop despite her resistance to sexual intercourse. The closest the appellant came to disputing her assertions was the single reply: "Whoa, did I really?" In contrast to that equivocal question, the appellant either minimized ("I guess things just happened to [sic] fast") or apologized ("I f[****]d this one up bad"; "You['re] right I'm wrong") after every other assertion. We also accord some weight to the testimony regarding the pretext phone call. Although the appellant's desire to mollify SrA MN is apparent from the testimony, it is also clear he did not disagree with SrA MN when she said he forced her to have sex with him. When

combined with the consistency between the assertions in the text messages and SrA MN's testimony at trial, we find her version of events more believable. Having weighed all the evidence in the record of trial and made allowances for not personally observing the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt.

*Post-Trial Delay*

The appellant asserts he is entitled to relief because the Government violated his due process right to timely post-trial processing of his case when 143 days elapsed after trial before the convening authority took action.

We review claims that an appellant was denied his due process right to speedy post-trial processing de novo. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). In conducting this review, we assess the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972*)*: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). There is a presumption of unreasonable delay when the convening authority does not take action within 120 days of the completion of trial. *Id.* at 142.

The appellant's trial concluded on 23 March 2013. The convening authority took action on 13 August 2013, 143 days after the court-martial ended. As the convening authority's action did not take place within 120 days of the completion of trial, the length of the delay is unreasonable on its face and we proceed to an analysis of the remaining three *Barker* factors.

Reasons for the delay

This factor weighs in favor of the appellant. While the record of trial was pending, the court reporter responsible for producing the transcript was engaged in the reporting and transcription of other cases, including an administrative discharge board. The transcript was not completed until 10 July 2013, 109 days after the court-martial ended. We recognize that this record of trial was somewhat lengthy (1102 pages) and find no personal fault with the court reporter. However, it is the Government's obligation to produce the record in a timely manner, including the dedication of sufficient resources to conduct and transcribe multiple cases when necessary.

The appellant's assertion of the right to timely review and appeal

This factor weighs strongly in favor of the appellant. Beginning on 4 June 2013, the appellant, through his defense counsel, asserted his right to timely post-trial

processing in order to pursue meaningful clemency. The appellant submitted three more demands for timely processing over the next seven weeks.

Prejudice

In *Barker*, the Supreme Court recognized a framework to analyze the prejudice factor in a speedy trial context, and the *Moreno* court adopted this framework in analyzing claims of prejudice arising from post-trial delay. *See Moreno*, 63 M.J. at 138. Under this framework, we analyze whether the following interests of the appellant have been prejudiced: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Id*. The appellant argues that the delay in post-trial processing prevented him from effectively seeking a reduction in confinement, but he does not assert any particular anxiety or concern nor any other limitation in his ability to seek appellate relief.

The appellant asserts that the delay prevented him from submitting his request for clemency "until his sentence was all but completed." Such confinement, however, is only oppressive if he succeeds on his substantive claim either in this court or with the convening authority. *See United States v. Arriaga*, 70 M.J. 51, 58 (C.A.A.F. 2011). The substantive claim for clemency was—like the appellant's assignment of error before this court—that the evidence was factually insufficient to support the trial court's findings. The convening authority did not grant clemency based on that argument. We also found no merit in this claim. Absent any other evidence of oppressive conditions of confinement, we do not find the appellant's incarceration, which was ultimately not in excess of what the convening authority approved, oppressive.

In making a determination whether a particular delay deprived an appellant of a due process right to speedy appellate review, we balance the four factors set out above. *Moreno*, 63 M.J. at 136. Although the delay in this case was long enough to trigger the *Moreno* presumption of excessive delay, it only exceeded the standard by 23 days. While the Government is responsible for this delay, it was a procedural failure rather than a bad-faith effort to frustrate this appellant's rights. The appellant's demand for timely post-trial processing, while raised early and persistently, must be considered in the context of the actual length of the delay in this case. Against those factors, we weigh the absence of any actual showing of prejudice against this appellant. Although he was delayed in being able to submit his request for clemency, the convening authority ultimately declined to grant that request. On these facts, we find that the delay did not constitute a due process violation.

We are also mindful of our authority to grant relief under *United States v. Tardif,* 57 M.J. 219 (C.A.A.F. 2002*)* and Article 66(c), UCMJ, 10 U.S.C. § 866(c), even in the absence of prejudice. We decline to do so here.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred.[4]  Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).  Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court

---

[4] We note the court-martial order (CMO) incorrectly states that the appellant was arraigned as an "AIRMAN FIRST CLASS."  In fact, at the time of trial the appellant was a Senior Airman.  Prior to arraignment, the charge sheet was amended to reflect this.  We order promulgation of a corrected CMO.